**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **DARRYL HURLOW,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 21 C 4049** |
| | ) | |
| **TOYOTA MOTOR NORTH AMERICA,** | ) | |
| **INC., TOYOTA MOTOR SALES U.S.A,** | ) | |
| **NATHAN LINDSTROM, BRAD ANDERSON,** | ) | |
| **and SPENCER ILLINGWORTH,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

MATTHEW F. KENNELLY, District Judge:

Darryl Hurlow has sued his former employer Toyota Motor Sales U.S.A. (TMS),

its parent company Toyota Motor North America (TMNA), and various TMS employees

for violations for the Family Medical Leave Act (FMLA) and the Illinois Human Rights

Act (IHRA). Hurlow alleges (1) sex discrimination in violation of the IHRA; (2)

interference with his right to FMLA leave; and (3) retaliation in violation of the FMLA and

the IHRA. All of the defendants have moved for summary judgment on all of Hurlow's

remaining claims. For the reasons stated below, the Court grants the defendants'

motion.

**Background**

Defendants ask the Court to exclude portions of Hurlow's responses to their

Local Rule 56.1 Statement and various exhibits that Hurlow provided in response to

their summary judgment motion. *See* Defs.' Reply at 1-3. Defendants also contend that

any allegedly discriminatory employment actions that took place prior to March 30, 2019 are time-barred because they occurred outside the statute of limitations period. *See Id.* at 3-5. Because excluding this evidence would not impact the Court's decision, the Court will consider all evidence in the record.

TMS "supports the sales and marketing efforts of independently owned and operated Toyota and Lexus dealerships." Defs.' L.R. 56.1 Stmt. ¶ 6. The Lexus Central Area (Lexus Central) supports Lexus dealerships in multiple states, including Illinois. Lexus Central is divided into five districts; Illinois dealers are in District 1.

TMS supports dealers through field traveler teams that travel throughout their assigned districts to meet with dealers. The field traveler teams consist of one District Sales Manager (DSM) and one District Services & Parts Manager[1] (DSPM). The "primary responsibility" of a DSM "is to serve as the primary point of contact for Toyota/Lexus Dealers within assigned District on all Vehicle Sales related activities." Defs.' L.R. 56.1 Stmt., Ex. G-5 at TOYOTA001064. DSPMs are responsible for "supporting the service operations of the dealers, which includes their performance, consultations, dealer guest satisfaction, and dispute resolution." Defs.' L.R. 56.1 Stmt. ¶ 16.

Each quarter, field travelers are ranked based on performance. The quarterly rankings are used to determine bonuses for field travelers and are also taken into consideration for promotions. Rankings are also used to determine the winners of various field traveler awards. For example, each year the field traveler with the highest

---

[1] The defendants refer to this position—inaccurately, the Court believes—as "District Sales & Parts Manager." *See* Defs.' L.R. 56.1 Stmt. ¶ 1.

average ranking is awarded the Field Traveler of the Year Award, which includes an opportunity to attend a company trip.  Defs.' L.R. 56.1 Stmt. ¶ 24.  Field travelers also receive annual performance evaluations.

From 2016 to 2018, the ranking system was "mainly based on dealer performance metrics" including sales, retention, and customer satisfaction.  Pl.'s L.R. 56.1 Stmt., Ex. D at 80:10-16.  To calculate the rankings, managers used a spreadsheet that attributed a point value to each category.  Starting in January 2018, rankings were partly based on the employee's execution of management-established "guardrails" that established an area of focus for field travelers' work with the dealers.  Each quarter the field travelers gave a presentation describing the work they completed within those guardrails.  Four managers rated the presentations: the Vehicle Operations Manager (VOM), the Customer Service Operations Manager (CSOM), the Vehicle Field Sales Manager (VFSM), and the Customer Services Field Manager (CSFM).  Following the presentations these four managers individually ranked each DSPM and DSM, and those ratings would be averaged for an employee's final ranking.  Seventy percent of a field traveler's final ranking is based on individual performance, and thirty percent is based on the field traveler's partner's performance.

## B. Hurlow's employment at TMS

Hurlow joined TMS as an intern in the fall of 2015.  In May 2016, he was promoted to a DSPM position at Lexus Central.  Defendant Nathan Lindstrom was a CSFM at Lexus Central from June 2018 through September 2019 before becoming a VFSM in October 2019.  Defendant Brad Anderson was a CSOM at Lexus Central from December 2015 until June 2021.  Defendant Spencer Illingworth was the Assistant

General Manager (AGM) at Lexus Central from January 2017 to November 2022.

TMS provided the quarterly field traveler rankings from first quarter 2018 to fourth quarter 2020, excluding the first quarter of 2020 due to the COVID-19 pandemic. The final DSPM rankings during this time period are as follows, with each particular employee's gender noted ("Darryl" is plaintiff Hurlow):

2018

|   | Q1 | Q2 | Q3 | Q4 |
|---|----|----|----|----|
| 1 | Hannah (F) | Hannah (F) | Hannah (F) | Hannah (F) |
| 2 | Jackie (F) | Rachel (F) | Darryl (M) | Rachel (F) |
| 3 | Darryl (M) | Darryl (M) | Tom (M) | Tom (M) |
| 4 | Rachel (F) | Tom (M) | Rachel (F) | Darryl (M) |
| 5 | Luke (M) | Luke (M) | Luke (M) | Luke (M) |

2019

|   | Q1 | Q2 | Q3[2] | Q4 |
|---|----|----|----|----|
| 1 | Rachel (F) | Tom (M) | Rachel (F) | Tom (M) |
| 2 | Luke (M) | Darryl (M) | Luke (M) | Luke (M) |
| 3 | Darryl (M) | Luke (M) | Tom (M) | Courtney (F) |
| 4 | Tom (M) | Rachel (F) | Courtney (F) | Darryl (M) |
| 5 | Courtney (F) | Courtney (F) |  | Stephanie (F) |

---

[2] The third quarter of 2019 coincided with Hurlow's FMLA leave, so he did not receive a ranking. Instead, because Hurlow worked for forty-seven percent of that quarter, he was given a bonus that amounted to that percentage of the average of his Q1 and Q2 bonuses. *See* Defs.' L.R. 56.1 Stmt., Ex. A-15.

2020

|   | Q1 | Q2 | Q3 | Q4 |
|---|----|----|----|----|
| 1 |    | Dan (M) | Dan (M) | Stephanie (F) |
| 2 |    | Stephanie (F) | Stephanie (F) | Courtney (F) |
| 3 |    | Courtney (F) | Luke (M) | Dan (M) |
| 4 |    | Luke (M) | Courtney (F) | Darryl (M) |
| 5 |    | Darryl (M) | Darryl (M) | Luke (M) |

*See* Defs.' L.R. 56.1 Stmt., ¶ 76.

In 2018, Hugh Dyer, Hurlow's manager, completed his performance evaluation. He identified "innovation" as an "area of improvement" for Hurlow.  Defs.' L.R. 56.1 Stmt., Ex. A-2 at TOYOTA000036.  Specifically, Dyer noted "tak[ing] the additional initiative to stand apart from peers" as a "next step" for Hurlow and specified that this included "making sure" that he is "communicating all that he is achieving and working on with his dealers," "volunteer[ing] for, and deliver[ing], on extra projects" and "developing unique and individual plans for each dealer."  *Id.*  Dyer also noted that potential challenges for Hurlow included demonstrating leadership with dealers, effective communication, and developing advocates.  *Id.*

In early January 2019, Hurlow requested a meeting with Illingworth.  Illingworth testified that Hurlow expressed his belief that "he was getting treated unfairly" regarding the rankings and the presentations.  Defs.' L.R. 56.1 Stmt. ¶ 66.  On January 11, 2019, Hurlow sent Illingworth a follow-up e-mail in which he noted that he had been passed

over for the 2018 promotion "despite his seniority and performance level." Defs.' L.R. 56.1 Stmt., Ex. A-4 at TOYOTA000354. He identified the "non-transparent process of promotions," district assignments, and "ranking based on inconsistent and subjective measures" as processes that "seem[ed]" to suggest he was being "discriminated against." *Id.* Hurlow also stated that "there is a fine line between favoritism and sexism." *Id.*

Illingworth forwarded the e-mail to Linda Perry, TMNA's Human Resources Business Advisor. Perry scheduled a phone call with Hurlow to discuss the e-mail. Perry's contemporaneous notes indicate that during the call Hurlow expressed his concerns about the "culture," "not being promoted" and the "[p]erformance/evaluation process." *Id.*, Ex. E at TOYOTA000314. Perry's notes reflect Hurlow's belief that in the last two DSM promotions, which went to female employees, a "less qualified DSPM was promoted over him," and that "managers travel more with female [employees]." *Id.* at TOYOTA000315. Perry's notes include references to multiple female employees, including "Hannah," "Jackie" and "Rachel." *Id.* Perry's notes also reflect that she told Hurlow that "females being promoted while he is not being promoted wouldn't be considered discrimination as leadership has indicated those that were promoted were ready for the next level." *Id.* at TOYOTA000317.

Lindstrom completed Hurlow's 2019 performance evaluation. As an area for improvement, Lindstrom suggested that Hurlow "focus on being one of the leaders in the timely execution of tasks and initiatives." *Id.*, Ex. A-2 at TOYOTA000038. Lindstrom cited examples where Hurlow failed to fulfill deadlines and identified an instance where he had "successfully conducted a thorough Service Consultation

review" but "didn't provide a first draft to area management until one week before the presentation" as a "learning opportunity." *Id.* Lindstrom stated that to "set himself apart as a top DSPM," Hurlow should "focus on how he communicates" and "better his time management." *Id.*

In July 2019, Hurlow applied for twelve weeks of FMLA leave for the birth of his daughter. Hurlow submitted his FMLA request to Lincoln Financial Group, which serves as TMS's third-party administrator for employee leave. On July 29, 2019, Hurlow met with Lindstrom, Anderson, and Illingworth to discuss his FMLA leave and TMS's plans for covering his job duties. Hurlow testified that Illingworth told him that he would not be eligible for any promotions while on FMLA leave. Illingworth testified that he informed Hurlow that he would not receive company alerts and notifications on promotion opportunities while he was on leave but that they did not discuss his eligibility for promotions. Hurlow returned to work in early November 2019.

Sarika Govind completed Hurlow's 2020 performance evaluation. She stated that opportunities for Hurlow included "serv[ing] as more of a leader within the team" and "be[ing] increasingly proactive." *Id.*, Ex. A-3 at TOYOTA000199. She also noted opportunities for Hurlow to be "diligent with the administrative components" of the DSPM role, including "adequate contact preparation in advance of the visit, timely contact report and expense report submissions, planning farther in advance when booking travel and being prompt to meetings." *Id.* Govind also cited instances of Hurlow providing expense reports that included late fees, delaying contact report submissions and arriving late to various meetings. *Id.*

**C.      DSM position openings from 2017-2020 and Hurlow's complaints**

**1.      2017 and 2018**

In 2017 TMS promoted Jaqueline Orellana, a female DSPM, and Tuarest Dillard, a male DSPM, to DSM positions.  Hannah Farmer, a female DSPM at Lexus Central, was promoted to a DSM position in late 2018.

**2.      September 2019**

TMS posted an opening for a DSM position in September 2019.  Hurlow did not have access to his work e-mail account while on leave and therefore did not receive an e-mail notification about the opening but instead learned of it from a coworker.  Hurlow called Illingworth to express his interest in the position.  He says that Illingworth stated he was ineligible for the promotion because he was on leave.  Illingworth testified that the conversation was limited to notifying Hurlow that he would not have access to his company e-mail while on leave and therefore would not receive alerts regarding DSM position openings.

On September 27, 2019, Hurlow sent Illingworth an e-mail to "memorialize" the phone conversation regarding his "appeal for consideration on the current DM position opening."  Defs.' L.R. 56.1 Stmt., Ex. A-28 at TOYOTA000313.   Hurlow stated that Illingworth had "indicated" he would not be considered for the DSM position "because the position has to be filled by next week."  *Id.*  Hurlow also referenced Illingworth's "statement back in July" that Hurlow "would not be eligible for any promotions" while on leave.  *Id.*  Hurlow also stated his view that despite Illingworth's comment that he was "not a top candidate" for the promotion, he was "more qualified, if not the most qualified, than any other candidates who submitted their interest for the position."  *Id.*  He stated

8

that it was "disingenuous that after [his] time, commitment, and performance with the company, [he] [was] still not considered the top candidate after being passed up for a promotion over Jackie, Hannah, and now presumably another female candidate." *Id.*

Illingworth spoke to Perry after receiving the e-mail, and the two later met in person to discuss it. Illingworth forwarded the e-mail to Perry along with "performance notes" regarding the decision for the September 2019 DSM position. Perry testified that she did not reach out to Hurlow because the situation "wouldn't have been something for HR to get involved with." Defs.' L.R. 56.1 Stmt., Ex. E at 103:10-21. She also indicated that the "business and the management team there could follow up with Darryl to communicate and share any feedback as to why he wasn't" selected. *Id.*

Rachel Lee, a female DSPM, was selected for the September 2019 DSM position. Defs.' L.R. 56.1 Stmt. ¶ 48.

### 4.     November 2019

Hurlow applied for a DSM position on November 11, 2019. Mark Winkler, a male DSPM in Toyota's Cincinnati region, was selected for the position. Hurlow testified that he believes TMS did not choose him in "retaliation for [his] complaint at the beginning of 2019 of essentially gender discrimination and retaliation for [his] FMLA leave." Defs.' L.R. 56.1 Stmt., Ex. A at 200:16-23.

### 5.     September 2020

Hurlow applied for another DSM position in September 2020. Ten candidates applied for this position. TMS ultimately selected Violet Szeliga, a female DSM in Toyota's Chicago region. Hurlow believes the "primary reason" TMS did not select him was "retaliatory in nature based on [his] previous complaint and [his] FMLA leave." *Id.*

at 207:5-12.

**D.    Present lawsuit**

TMS promoted Hurlow to a DSM position in June 2021.  Hurlow's gender discrimination claim in this suit involves the denial of earlier promotions as well as other allegedly unequal terms and conditions of employment.  His FMLA claims involve alleged interference with his taking of FMLA leave and retaliation for doing so.  Hurlow also asserts a claim that he was denied promotions in retaliation for complaining about gender discrimination.

**Discussion**

Summary judgment is appropriate if the defendant demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Hanover Ins. Co. v. N. Bldg. Co.*, 751 F.3d 788, 791 (7th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  When considering a motion for summary judgment, the Court views the facts in the light most favorable to the nonmoving party.  *Logan v. City of Chicago*, 4 F.4th 529, 536 (7th Cir. 2021).  "The mere existence of an alleged factual dispute will not defeat a summary judgment motion; instead, the nonmovant must present definite, competent evidence in rebuttal." *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004).

**A.    IHRA gender discrimination claims**

Hurlow alleges that the defendants violated the IHRA by discriminating against him based on his male gender.  Illinois courts apply the federal Title VII framework to

IHRA claims. *Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 383 (7th Cir. 2016).

The Seventh Circuit's Title VII caselaw previously distinguished between "direct" and "indirect" methods of proving intentional discrimination. In *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016), the Seventh Circuit directed district courts to instead evaluate the relevant evidence "as a whole" to determine whether it would "permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Id.* But the *McDonnell Douglas* burden-shifting framework remains an acceptable means of "organizing, presenting, and assessing circumstantial evidence" in a discrimination case. *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). Because the parties proceed under the *McDonnell Douglas* framework, the Court will evaluate defendants' motion under that standard.

*McDonnell Douglas* requires the plaintiff to establish a prima facie case of discrimination by demonstrating that (1) he is a member of a protected class; (2) he met his employer's legitimate job expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees outside of the protected class were treated more favorably. *Lucas v. Chi. Transit Auth.*, 367 F.3d 714, 728 (7th Cir. 2004). Because it is the "unusual employer who discriminates against majority employees," courts in this Circuit modify the first element for plaintiffs who are not members of historically discriminated-against groups. *Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 456–57 (7th Cir. 1999). Specifically, a male plaintiff alleging sex discrimination must show "background circumstances" or "evidence that there is something 'fishy' going on." *Farr v. St. Francis Hosp. & Health Ctrs.*, 570 F.3d 829, 833 (7th Cir. 2009)

(citation omitted).  If the plaintiff demonstrates a prima facie case of discrimination, the burden shifts to the employer to provide a legitimate "nondiscriminatory reason" for its actions.  *Id.*  If the employer does so, the burden shifts to the plaintiff to show that the stated reason is a pretext for discrimination.  *Id.*

The Court will address the prima facie case factors a bit out of sequence, taking "adverse action" first.

### 1.     Adverse employment action

Denial of a promotion obviously amounts to an adverse action; the defendants do not argue otherwise.  They contend, however, that none of the other challenged actions amount to actionable adverse action.

### a.     District assignments

Hurlow argues that that he was "continually getting passed over for District 1" and assigned to "less desirable districts" and that these assignments "affected his prospects of promotion."  Pl.'s Resp. Defs.' Mot. for Summ. J. at 10.   To be actionably adverse, the district assignments must have had some impact on Hurlow's employment conditions, such as "affect[ing] benefits or wages," hindering "career prospects" or "resulting in fewer promotional opportunities."  *Firestine v. Parkview Health Sys., Inc.*, 388 F.3d 229, 235 (7th Cir. 2004);  *Breneisen v. Motorola, Inc.*, 512 F.3d 972, 979 (7th Cir. 2008).

Hurlow conceded that district assignments do not include a change in job responsibilities and that assignment to District 1 is "not a promotion."  Pl.'s L.R. 56.1 Stmt., Ex. C at 216:9-217:12.  He noted, however, that District 1 is the "most desirable" due to the ability to be "at home every night."  *Id.*  But Hurlow's desire to receive a

District 1 assignment alone is not sufficient to establish that his assignment to other districts was an adverse action. *Bisluk v. Hamer*, 800 F.3d 928, 935 (7th Cir. 2015) (concluding plaintiff's assignment to less desirable location was not adverse action); *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 781 (7th Cir. 2007) (holding plaintiffs' preference for one assignment over another did not support materially adverse employment action argument). Similarly, TMS's denial of Hurlow's request to be assigned to a district closer to home is not an actionable adverse action. *See Spring v. Sheboygan Area Sch. Dist.*, 865 F.2d 883, 886 (7th Cir. 1989) (holding employer's transfer to new district did not constitute materially adverse action despite increased commute time).

Hurlow offers no evidentiary support for his contention that not receiving a District 1 assignment impacted his promotional prospects. Thus his argument fails on that point. *See O'Neal v. City of Chicago*, 392 F.3d 909, 912 (7th Cir. 2004) (rejecting plaintiff's argument that employer's transfer denial negatively impacted employment prospects due to lack of evidence).

### b. Bonuses/rankings

A negative performance evaluation or lower performance rating does not, by itself, constitute an actionable adverse action. *Silk v. City of Chicago*, 194 F.3d 788, 803 (7th Cir. 1999); *Lowell v. Brown*, No. 96–C–562, 2000 WL 521726, at *8 (N.D. Ill. Mar.2, 2000) (concluding lower performance rating was not materially adverse because it did not decrease plaintiff's bonus). Hurlow argues, however, that due to his lower rankings he consistently received a smaller bonus.

It is undisputed that TMS used quarterly rankings to determine bonuses for field

travelers. An employment action that causes a reduction in the employee's compensation generally constitutes an adverse employment action. *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996). But the "loss of a bonus is not an adverse employment action . . . where the employee is not automatically entitled to the bonus." *Maclin v. SBC Ameritech*, 520 F.3d 781, 788 (7th Cir. 2008) (citation omitted). The parties dispute whether bonuses were discretionary or automatic. Chris Tenebehn, a Toyota CSOM, testified that quarterly bonuses are allocated based on rankings and that there is "never a case where a field traveler will get $0 in bonus." Pl.'s Resp. Defs.' L.R. 56.1 Stmt., Ex. A at 85:5-16. And Hurlow received a bonus in the third quarter of 2019 when he was on FMLA leave, which suggests that TMS provides bonuses to employees regardless of performance for the full quarter. In contrast, defendants provide no supporting citation for their assertion that field travelers do not always receive a bonus. If the quarterly rankings were, as Hurlow contends, manipulated in a manner that lowered his bonus, that could qualify as an adverse employment action. *See Lewis v. City of Chicago*, 496 F.3d 645, 654 (7th Cir. 2007).

### c. Presentation penalties

Hurlow's contention that the defendants "treated him differently in regards to presentation criteria" is not adequately supported by the record. *See* Pl.'s Resp. Defs.' Mot. for Summ. J. at 9. It is undisputed that TMS managers imposed a time limit for field traveler presentations. Lindstrom's written feedback for Hurlow's fourth quarter 2019 presentation includes a section labeled "opportunities." Defs.' L.R. 56.1 Stmt., Ex. H-1 at TOYOTA001340. In this section, Lindstrom wrote "[t]eam was over 6 minutes on time, stick to the 30-minute window." *Id*.

14

A reprimand or negative feedback amounts to actionable adverse action, however, only if it is accompanied by some "tangible job consequence." *Lucas*, 367 F.3d at 731. Hurlow cites Lindstrom's declaration for the assertion he was "negatively impacted in his presentation score" for exceeding the time limit. Pl.'s L.R. 56.1 Stmt. ¶ 18. But this does not support the proposition that he was "penalized" for exceeding the allotted presentation time. Lindstrom stated otherwise, *see* Defs.' Mot. for Summ. J, Ex. H ¶ 6, and Hurlow has offered no contrary evidence. He contends that "Defendants would cite to . . . Plaintiff's presentation as a reason why he was not promoted," Pl.'s Resp. to Defs.' Mot. for Summ. J. at 7, but he cites only to Lindstrom's fourth quarter 2019 feedback, which says nothing about Hurlow's promotional prosects. This is insufficient.

### d. Awards

Hurlow also contends that the defendants "manipulated the Field Traveler of the Year Award and the L-Certified Contest" to favor female employees. Pl.'s Resp. to Defs.' Mot. for Summ. J. at 9. But none of the citations he offers in support mention the "Field Traveler of the Year Award." *See id*. The Court assumes that Hurlow is referring to the 2017 "Field Traveler's Award" that, in his amended complaint, he alleged was "given to Jaqueline Orellana, a female, who was pushed into the first ranking spot for 2017 based on the subjective points from Defendants." Am. Compl. ¶¶ 24-25. Hurlow also alleges that the criteria for the preowned L-Certified contest, which awarded dealers and a top-performing DSM a trip to Aspen, Colorado, were altered "because they wanted a female to win." Defs.' Stmt. of Mat. Facts., Ex. A at 49:15-50:18.

Hurlow offers no evidence, however, that he experienced a "significant change in

employment status" as a result of losing these contests.  The winner of the contests got a free trip, not any change in compensation or responsibilities.  The denial of such a "perk" does not qualify as actionable adverse action.  *See Markel v. Bd. of Regents of Univ. of Wisc. Sys.*, 276 F.3d 906, 911 (7th Cir. 2002) (concluding denial of travel opportunities did not amount to adverse action); *O'Neal v. City of Chicago*, 317 F. Supp. 2d 823, 828 (N.D. Ill.), *aff'd*, 392 F.3d 909 (7th Cir. 2004) (holding loss of parking space, cell phone, flexible hours and company vehicle do not qualify as actionable adverse actions).

Hurlow contends that "the winning of awards relate [sic] directly to ranking (Field Traveler of the Year Award), sales numbers (L-Certified Award) and thus are items considered in promotion."  Pl.'s Resp. to Defs.' Mot. for Summ. J. at 9.  But the evidence in the record indicates that a field traveler's performance impacts eligibility for the award, not that TMS uses the receipt of an award to evaluate the field traveler's performance.  Although Hurlow was no doubt displeased that he did not win the contests, this is insufficient.  *See Herrnreiter v. Chi. Hous. Auth.*, 315 F.3d 742, 744 (7th Cir. 2002) (noting that not every action that displeases the employee rises to the level of an adverse action).

### e.    Travel

Hurlow asserts that he "was traveled with less and, as a result, trained and taught less by managers."  Pl.'s Resp. to Defs.' Mot. for Summ. J. at 7.  "A discriminatory denial of job-related training can constitute an adverse employment action under Title VII."  *Durkin v. City of Chicago*, 341 F.3d 606, 611 (7th Cir. 2003). But Hurlow points to no evidence that the claimed loss of training impacted his

"compensation, benefits, work hours, job title, or ability to advance within [Toyota]," and thus no reasonable jury could find this was an actionable adverse action. *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 574 (7th Cir. 2001); *Kruger v. Principi*, 420 F. Supp. 2d 896, 916 (N.D. Ill. 2006) ("[T]he denial of training opportunities does not constitute an adverse employment action.").

In sum, the only adverse actions Hurlow identifies that a reasonable jury could find actionable, aside from denial of promotions, arise from the circumstances surrounding his ranking and corresponding bonuses.

### 2.     Background circumstances

The first element of a prima facie case on a claim of "reverse" discrimination involves "background circumstances" suggesting the employer discriminates against groups that have not historically been the object of discrimination.  "The contours of what constitutes a background circumstance are not precise."  *Mills*, 171 F.3d at 455. Examples include "evidence of schemes to fix performance ratings to their detriment, that the hiring system seemed rigged against them because it departed from the usual procedures in an unprecedented fashion, or that they were passed over despite superior qualifications."  *Id.* (citation omitted).  Hurlow contends that (1) the defendants promoted women with "minimal qualifications," and (2) TMS did not launch a proper investigation following his complaints about the discriminatory treatment of male employees.

Hurlow argues that TMS's failure to provide any "metrics or standards" regarding how candidates for promotions are evaluated "casts doubt on the legitimacy of Defendants' claims."  Pl.'s Resp. to Defs.' Mot. for Summ. J. at 5-6.  But as the party

alleging discrimination, Hurlow has the burden of showing that there is a reason to believe his employer discriminates against men. *Phelan v. City of Chicago*, 347 F.3d 679, 685 (7th Cir. 2003) ("[I]n order to gain the substantial benefits conferred by the use of the *McDonnell Douglas* test, the non-minority plaintiff must be able to plead facts to show why it is likely in this case, that an employer had engaged in such unusual behavior."). Hurlow's contention that the defendants did not use objective promotion standards does not give rise to an inference that the promotion process was discriminatory. *See Stockwell v. City of Harvey*, 597 F.3d 895, 902 (7th Cir. 2010) ("Subjective evaluations of each candidate are entirely consistent with Title VII."); *Sattar v. Motorola, Inc.*, 138 F.3d 1164, 1170 (7th Cir. 1998) ("[N]othing in Title VII bans outright the use of subjective evaluation criteria."); *see also Movement for Opportunity & Equal. v. Gen. Motors Corp.*, 622 F.2d 1235, 1277 (7th Cir. 1980) (noting the difficulty of eliminating subjectivity from employee performance and promotion evaluations).

The subjective qualifications that Hurlow identifies, such as "organizational skills," collaborative abilities" and ability to "control[] the controllables," are all facially gender neutral. Hurlow identifies no evidence suggesting that TMS tailored these criteria to favor female candidates or applied them differently for male candidates. Thus TMS's use of subjective metrics do not support Hurlow's claim. *See Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 394 (7th Cir. 2010) (rejecting plaintiff's argument that employer's subjective expectations were inherently discriminatory); *Sattar*, 138 F.3d at 1170 (holding employer's use of subjective evaluation criteria did not render employee's termination discriminatory). Just as importantly, Hurlow provides no evidence to support his assertion that the women promoted to DSM positions had "minimal

qualifications." On the contrary, the defendants have offered extensive evidence regarding the qualifications of every female candidate who was promoted over Hurlow. *See, e.g.*, Defs.' L.R. 56.1 Stmt. ¶¶ 49-50, 61-62.

TMS also considered quarterly rankings in the DSM hiring process. Hurlow has adduced no evidence to support his contention that the defendants manipulated the ranking system to favor women. His contention that "the ranking itself is a vehicle for discrimination" solely due to the lack of "any set objective measures" is contrary to the case law of this Circuit. Pl.'s L.R. 56.1 Stmt., Ex. C at 211:17-212:12; *see Blise v. Antaramian*, 409 F.3d 861, 868 (7th Cir. 2005) ("This court has . . . never held that a job interview must be scored according to some sort of objective criteria."); *Weihaupt v. Am. Med. Ass'n*, 874 F.2d 419, 429 (7th Cir. 1989) ("The mere fact that [employer]'s beliefs were based on subjective factors fails to establish that their assessment of [plaintiff]'s skills were made in bad faith."). It is undisputed that, during certain quarters, female DSPMs were ranked more highly than Hurlow and other male employees. But during other quarters, male employees, including Hurlow, were ranked at or near the top. No reasonable jury could find a consistent pattern of ranking women higher. In short, Hurlow has adduced no evidence that TMS used any subjective metrics to facilitate discriminatory hiring activity or performance evaluations.

Hurlow compares the circumstances in this case to those in *Mills v. Health Care Service Corp.*, 171 F.3d 450 (7th Cir. 1999), and *Hague v. Thompson Distribution Co.*, 436 F.3d 816 (7th Cir. 2006). But there are important distinctions. In *Mills*, a male plaintiff brought a Title VII gender discrimination action against his employer after a woman was selected for a new assistant manager position. *Mills*, 171 F.3d at 453.

19

Although the plaintiff was unable to demonstrate that his qualifications were clearly superior to the other candidate's, the Seventh Circuit held that the plaintiff had shown sufficient background circumstances because during a seven-year period "nearly all promotions at the office went to women, and at the time the challenged hiring decision was made, females dominated the supervisory positions in the relevant office." *Id.* at 457. Similarly, in *Hague*, the Seventh Circuit found that the white plaintiffs had shown fishy background circumstances by providing evidence that "their black boss fired them and replaced three of them with black employees, the fourth plaintiff's job was assumed by a black employee, and the fifth was not replaced." *Hague*, 436 F.3d at 822.

That is not the case here. Over the period at issue, there were six DSM openings at Lexus Central. Five were filled by promotion: three women and two men. The sixth was filled by transferring a female DSM from another district. Four of six is not so disproportionate as the pattern in *Mills*; it's hard to say that sixty-six percent amounts to "nearly all" of the open positions. And Hurlow does not contend that the women promoted during this time period replaced males or that an all-male DSM team was replaced by an all-female DSM team, or anything close to it. And by itself, the fact that TMS promoted two men, Tuarest Dillard and Mark Winkler, to DSM positions tends to undercut his reliance on hiring patterns. *See Gore v. Indiana Univ.*, 416 F.3d 590, 593 (7th Cir. 2005) (noting that employer's hiring of a man before two women undercut "reverse" discrimination claim).

Furthermore, the decision makers for quarterly rankings and the DSM promotions at Lexus Central were predominantly male during the relevant time period. For example, during the hiring process for the September 2019 DSM position, all of the

managers who provided input for the hiring decision were males. In sum, the evidence falls far short of a situation where a reasonable factfinder could find "fishy" background circumstances similar to those considered in *Mills* and *Hague*. *See Lowell v. Brown*, 2000 WL 521726, at *6 (finding male plaintiff had failed to establish fishy circumstances where workplace was male-dominated and there was no evidence workplace evaluations were manipulated to favor female employees).

Hurlow also takes issue with TMS's handling of his allegations of potential sex discrimination at Lexus Central. After receiving Hurlow's January 2019 e-mail, Perry spoke with Illingworth and set up a phone conversation with Hurlow. Perry testified that after the phone call she considered Hurlow's statements regarding the treatment of female employees as "concerns" rather than "complaints" that would suggest a violation of company policy. Pl.'s L.R. 56.1 Stmt., Ex. H at 79:23-80:13. She later determined that the matter did not "warrant[] further investigation." *Id.* at 87:22-88:15. Hurlow has not adduced evidence that Perry deviated from Toyota's anti-discrimination policy and or that Perry handled his comments differently from those of any other employee. Even were one to assume that TMS instituted inadequate anti-discrimination policies or that employees did not always adhere to them, Hurlow points to no legal authority to support the proposition that this is sufficient to show fishy background circumstances. *See Napier v. Orchard Sch. Found.*, No. 1:19-cv-03556, 2023 WL 2388715, at *9 (S.D. Ind. Mar. 7, 2023) (concluding evidence of deficient personnel policies does not constitute fishy background circumstances).

"[T]he bare fact that a woman got a job that a man wanted to get or keep" is insufficient, without more, to raise an inference that an employer is inclined to

discriminate against men. *Preston v. Wisconsin Health Fund*, 397 F.3d 539, 542 (7th Cir. 2005). Hurlow has not offered evidence that would permit a finding that TMS discriminated against men in general, and thus he has not satisfied the first element of the modified *McDonnell Douglas* test. Nevertheless, the Court will discuss the other elements to provide a complete analysis.

### 3. Legitimate job expectations

TMS does not dispute that Hurlow was meeting his employer's legitimate job expectations at all times relevant to this litigation. He was likewise formally qualified for the promotions he sought. Hurlow has satisfied this element of the modified *McDonnell Douglas* test.

### 4. Similarly situated individuals – claims other than promotion denials

Setting aside the promotion denials, Hurlow's discrimination claim falls short at the fourth element of the prima facie case, because he has not identified a proper comparator for any of the actionable adverse actions. On this element, Hurlow must point to female employees who are "directly comparable in all material respects." *Sartor v. Spherion Corp.*, 388 F.3d 275, 279 (7th Cir. 2004). Typically this means that the comparators "dealt with the same supervisor, were subject to the same standards and engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2012) (citation omitted). Hurlow has identified four women he believes that TMS treated more favorably: Jacqueline Orellana, Hannah Farmer, Rachel Lee and Stephanie Biesboer. These women were DSPMs at Lexus Central prior to their promotions and therefore had the same position and manager as

22

Hurlow.

Hurlow argues that managers deliberately ranked him lower than female employees. But he points to no performance evaluations, manager feedback, or any other information that would support a contention that the comparators had similar or inferior job performance than Hurlow but received higher rankings or bonuses. Hurlow points to the fourth quarter 2019 presentations, arguing that he was the only field traveler negatively impacted for exceeding his presentation time. But this contention does not hold water.

First, as noted earlier, the evidence Hurlow cites for the proposition that he was "disciplined" for going over the allotted time actually indicates nothing about a "penalty." Hurlow contends that other field travelers were "praised for going over and being thorough," Pl.'s Resp. Defs,' Mot. for Summ. J. at 16, but the portion of the record he cites to does not support this assertion. There is no indication in Lindstrom's notes that he "praised" any of the presenters for exceeding their time limits, and Stephanie Beisboer testified that she could not recall ever exceeding the allotted time or being penalized for doing so.

Second, there is no evidentiary support for Hurlow's contention that TMS applied the presentation time restrictions differently to female employees. Beisboer, who Lindstrom identified as having exceeded the presentation time limit that quarter, testified that she wasn't aware of any penalty for doing so. Beisboer testified only that she requested presentation feedback and "would receive it in a conversation." Pl.'s L.R. 56.1 Stmt., Ex. L at 32:24-33:2. This suggests a factual question regarding whether Beisboer ever got the feedback Lindstrom indicated in his notes, but that is immaterial

regarding whether Hurlow's presentations were evaluated differently because he is a man. Furthermore, Beisboer ranked *lower* than Hurlow in the fourth quarter of 2019, so it is hard to see how any penalty that Hurlow claims he was assessed materially impacted him.

Third, it is undisputed that the quarterly rankings are not based solely on the employee's presentation. For the majority of the relevant time period, TMS calculated quarterly rankings using a scoring formula based seventy percent on the employee's own performance, and thirty percent on the performance of the employee's partner. Here, there is no reason to believe that Hurlow's lower ranking was solely because he exceeded the presentation time limit. It is possible, for example, that both Hurlow and the female employees Lindstrom identified were "penalized" for exceeding their allotted time but had a higher overall score or were boosted by their partner's high score. It is equally plausible that neither Hurlow nor the female employees received a penalty for exceeding the time limit. At best, Hurlow has proven that Lindstrom considered adhering to the presentation time limit an area of improvement for Hurlow, but given that Lindstrom also identified it as an opportunity for improvement for other female employees, there is no evidence of favorable treatment. Hurlow has not demonstrated that this penalty existed, much less that TMS or the managers disparately applied it based on sex.

Hurlow also points to several exhibits he produced that he contends demonstrates that his "performance metrics were the best of any other DSPM" in 2017 and 2018. Pl.'s L.R. 56.1 Stmt. ¶¶ 6-8. He offers these exhibits as proof that the rankings were manipulated to favor Orellana, Farmer and Lee. *See id.* Defendants ask

the Court to strike these exhibits on the ground that Hurlow has not sufficiently authenticated them. But regardless of whether these exhibits are admissible, they do not support Hurlow's argument. It is undisputed that during the relevant time period, quarterly rankings were not solely based on performance metrics. Defs.' L.R. 56.1 Stmt. ¶ 23; Pl.'s L.R. 56.1 Stmt. ¶ 3. Thus even if one accepts Hurlow's contention that he had the best "performance metric" of all DSPMs at Lexus Central, the fact that he did not have the highest quarterly ranking in a system based on multiple factors—not just the performance metric—would not permit a reasonable jury to find that TMS treated other employees more favorably based on their gender (or his). And despite Hurlow's insistence that the quarterly rankings are a flawed metric of job success, he has not adduced any other evidence that sheds light on the performance histories of the female DSPMs. Hurlow's assessments of his own work performance are insufficient to permit a reasonable jury to find that they were similarly situated to him but treated differently. *See Maclin*, 520 F.3d at 789.

In sum, no reasonable jury could find that Hurlow has established a prima facie case of gender discrimination in violation of the IHRA.

### 5. Similarly situated individuals – promotion claims

The Court next addresses the fourth prima facie case element regarding Hurlow's claims involving denial of promotions. In his response brief, Hurlow does not meaningfully argue that Orellana, Farmer, Lee and Szeliga were less qualified than him and instead skips ahead to his contention that TMS's reasons for promoting them and not him were pretextual. *See* Pl.'s Resp. to Defs.' Mot. for Summ. J. at 8, 10-12. Hurlow's argument "puts the pretext cart before the prima facie horse." *Brummett v.*

*Lee Enters., Inc.*, 284 F.3d 742, 744 (7th Cir. 2002). Under the *McDonnell Douglas* standard, the plaintiff must first satisfy every element of a prima facie case of discrimination *before* the burden shifts to the defendant to offer a non-discriminatory reason for hiring the selected candidate. *Id.* Outside of his personal assessments of his own capabilities, Hurlow has provided no evidence that would allow a reasonable juror to conclude that the female candidates promoted over him were not better qualified.

Lindstrom testified that he recommended Lee over Hurlow for the September 2019 DSM position because she was "more organized" and "more detailed" than Hurlow. Defs.' L.R. 56.1 Stmt., Ex. B at 201:24-202:5. Lindstrom also testified that Lee "performed better than [Hurlow] when driving change, when communicating, when controlling the controllables." *Id.* at 202: 10-19. Illingworth testified that Lee was "in most cases, early with deadlines or meeting deadlines," and "[r]elations with dealers were good." Pl.'s L.R. 56.1 Stmt, Ex. I at 80:9-29. Illingworth testified that Farmer was "responsive and on time with her work" and "[h]andled administrative stuff well." Pl.'s L.R. 56.1 Stmt, Ex. I at 75:18-76:3. Before being selected for the DSM position at Lexus Central, Szeliga had accrued experience as a DSM at another Toyota location. Pl.'s L.R. 56.1 Stmt, Ex. I at 92:11-21. In addition to her experience, Illingworth also cited the "positive feedback" she received from the Chicago region as well as her "communication skills" as reasons for the decision to hire her. *Id.* Hurlow offers no evidence that would give rise to a genuine dispute on these points.

On Hurlow's performance evaluations from 2018-2020, his managers noted their concerns with his proficiency in many of the skills that TMS cites as reasons for

promoting the female DSPMs over him, including communication, time-management, performing administrative duties and ability to meet deadlines.  *See* Defs.' L.R. 56.1 Stmt., Ex. A-2 at TOYOTA000038; *id.*, Ex. A-3 at TOYOTA000199.  And it is undisputed that Hurlow's manager had concerns about Hurlow's ability to succeed in the DSM position due to an issue he had with a dealer.  Defs.' L.R. 56.1 Stmt. ¶ 57.

It is true, as Hurlow notes, that these criteria are largely subjective.  But the task in a discrimination case is not to review an employer's criteria to determine whether they amount to "best business practices"; the question is whether a reasonable jury could find differential treatment of otherwise similarly situated persons.  *See Blise*, 409 F.3d at 867.

Hurlow has given the Court no reason to believe that he has a sufficient basis to evaluate the qualifications of the female DSPMs that were promoted to DSM positions from 2018-2020.  And his own performance evaluations from 2018-2020 demonstrate a documented decline in his job performance in part due to his timeliness and expense reporting issues.  *See, e.g.*, id., Ex. A-2 at TOYOTA000038.  Furthermore, during the period that Hurlow was passed over for the promotions, multiple managers expressed concerns about his time management, leadership, communication and organizational skills.  *See id*.  Hurlow has adduced no evidence that the managers of the female employees promoted to DSM positions expressed similar concerns, and he has offered no competent evidence that would permit a reasonable jury to find that they were similarly situated to Hurlow yet were chosen for a promotion over him, or even that their evaluations were conducted on a basis different from his.  Rather, Hurlow has offered only his disagreement with his managers' assessments.  His contention that he was the

more qualified candidate—which is all Hurlow has—is insufficient, without more, to withstand summary judgment. *See Jordan v. City of Gary*, 396 F.3d 825, 834 (7th Cir. 2005) (noting plaintiff's failure to introduce evidence establishing candidate chosen for promotion had committed similar disciplinary infractions); *Nowak v. Int'l Truck & Engine Corp.*, 406 F. Supp. 2d 954, 965 (N.D. Ill. 2005) ("[Plaintiff] argues that he was the better qualified candidate based on nothing more than his own opinion, which is insufficient to create an issue of fact.").

Hurlow provided multiple exhibits that he contends demonstrate that his "performance metrics" were superior to those of the female candidates that were promoted to the DSM position. *See* Pl.'s L.R. 56.1 Stmt. ¶ 6. As discussed above, this evidence would not be sufficient to permit a finding in Hurlow's favor, given a hiring process that considers multiple factors outside of performance metrics. For example, the job posting for the September 2019 DSM position lists "[s]trong communication, organizational, and interpersonal skills" as requirements. Defs.' L.R. 56.1 Stmt, Ex. G-5 at TOYOTA001065. Hurlow has not offered evidence from which a reasonable jury could find that he was more qualified for the DSM position than Orellana, Farmer, Lee or Szeliga.

### 6. Pretext

Even if Hurlow could establish a prima facie case, no reasonable jury could find that the non-discriminatory reasons defendants offer for promoting the female candidates or any other alleged adverse actions are pretextual. Pretext "means a lie, specifically a phony reason for some action." *Russell v. Acme–Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995). The Seventh Circuit has held that "where an employer's proffered

non-discriminatory reason for its employment decision is that it selected the most
qualified candidate, evidence of the applicants' competing qualifications does not
constitute evidence of pretext unless those differences are so favorable to the plaintiff
that there can be no dispute among reasonable persons of impartial judgment that the
plaintiff was clearly better qualified for the position at issue." *Millbrook*, 280 F.3d at
1180 (citation omitted).

No reasonable jury could find that Hurlow's credentials for the promotion were so
superior to the female candidates' that a reasonable employer who was not
discriminating would not have selected them over him. The job posting for the
September 2019 DSM position stated that the ideal candidate should have "[s]trong
communication, organizational, and interpersonal skills." Defs.' L.R. 56.1 Stmt., Ex. G-5
at TOYOTA001065. The posting also stated the position required "[f]ormation of
professional and productive relationships" with dealers, "[t]imely and professional
submission of all requested reports" and "[s]tay[ing] within travel policy guidelines."
*Id.* at TOYOTA001064. The record reflects that Hurlow's managers noted his issues
with these specific skills. As the Court has discussed, Hurlow has not offered evidence
that would permit a reasonable jury to find that these determinations were skewed
based on gender. Similarly, Hurlow has adduced no evidence that the defendants'
stated reasons for the decisions underlying his rankings and the allocation of his
quarterly bonus were anything other than their real reasons. There is no evidence in the
record to support a reasonable inference that TMS used Hurlow's job performance as a
pretext for sex discrimination.

The Court also notes that the question in a case like this is not whether TMS

29

employed the "best" or most rational promotion process or whether it erred by not promoting Hurlow earlier. *See Essex v. United Parcel Serv., Inc.*, 111 F.3d 1304, 1310 (7th Cir. 1997). Rather, it is whether Hurlow has adduced evidence that would permit a jury to find that TMS's claimed rationale for selecting the other candidates was not the real reason for its actions. *Blise*, 409 F.3d at 867. Hurlow has offered no such evidence. His disagreement with TMS regarding whether he was a better candidate would not permit a reasonable jury to find pretext. *Barnes-Staples v. Carnahan*, 88 F.4th 712, 718 (7th Cir. 2023). The defendants are therefore entitled to summary judgment on Hurlow's IHRA sex discrimination claims based on failure to promote.

**B.    IHRA retaliation claim**

Hurlow contends that the defendants retaliated against him for complaining "about discrimination and the biased nature of the ranking system." Pl.'s Resp. to Defs.' Mot. for Summ. J. at 13. To establish a prima facie case of retaliation, Hurlow must provide evidence of "(1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two." *Abebe v. Health & Hosp. Corp.*, 35 F.4th 601, 607 (7th Cir. 2022).

**1.    Protected activity**

Defendants contend that Hurlow did not engage in any IHRA protected activity. Specifically, they argue that Hurlow's January 2019 conversation with Illingworth, his January 2019 e-mail, and his September 2019 e-mail to Illingworth discuss only "vague concerns" and do not amount to protected activity.

"[A]n informal complaint may constitute protected activity for purposes of retaliation claims." *Davis v. Time Warner Cable*, 651 F.3d 664, 674 (7th Cir. 2011)

(citation omitted).  But to qualify, a complaint "must indicate the discrimination occurred because of sex, race, national origin, or some other protected class."  *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006).

Hurlow testified that during his January 2019 conversation with Illingworth he lodged complaints regarding "discrimination in the quarterly presentations."  Pl.'s L.R. 56.1 Stmt., Ex. C at 80:10-17.  Illingworth testified that although Hurlow expressed during the conversation that he "felt like he was getting treated unfairly," he didn't consider Hurlow's complaints to be related to discrimination.  Defs.' L.R. 56.1 Stmt., Ex. C at 106:1-14.  But Illingworth also testified that when he received Hurlow's e-mail, he "saw sexism and stuff like that," which "raised some flags" and prompted his decision to forward the e-mail to Perry.  *Id.* at 106:18-22.  Illingworth's testimony demonstrates that even if he did not consider Hurlow's initial verbal complaints to be discrimination complaints, he understood Hurlow's comments in the follow-up e-mail to be at least partly related to "sexism."  And in his e-mail Hurlow directly referenced multiple courses of conduct that he believed indicated that the "fine line between favoritism and sexism" may be "blurred," and also explicitly stated his belief that he was being "discriminated against."  Defs.' L.R. 56.1 Stmt., Ex. A-4 at TOYOTA000354.  Hurlow's e-mail clearly referenced his belief that he was subject to discriminatory conduct, and Hurlow indicated that the contents of his e-mail "memorialize[d]" his conversation with Illingworth.  *Id.*  Viewing the facts in the light most favorable to Hurlow, a reasonable jury could conclude that both his conversation with Illingworth and his follow-up e-mail qualify as protected activity.

Perry also testified that during her January 2019 phone call with Hurlow he "didn't

make any claims about discrimination."  Defs.' L.R. 56.1 Stmt., Ex. E 48:7-23.  But Perry also testified that during the call Hurlow "had concerns with a few of his colleagues who were promoted," and that she responded to those concerns by expressing that "as a company, we don't promote based on gender."  *Id.* at 75:18-76:2. And Perry's contemporaneous notes from the call indicate that the call included discussion of disparate treatment based on gender.  Defs.' L.R. 56.1 Stmt., Ex. E-2 at TOYOTA000316.  Perry's notes reflect that Hurlow's complaints "indicat[ed] a connection to a protected class" or at the very least "provid[ed] facts sufficient to create that inference."  *Kodl v. Bd. of Educ. Sch. Dist. 45*, *Villa Park*, 490 F.3d 558, 563 (7th Cir. 2007) (citation omitted).

A reasonable jury could find that Hurlow's complaints involved protected activity.

## 2.    Adverse employment action

Hurlow alleges that following his discrimination complaints the defendants unfairly targeted him by "requesting discipline/issues for only [Hurlow], writing [him] up for issues such as timeliness and credit card late fees that are relevant to all Field Travelers, judging his quarterly presentations differently and more harshly than other Field Travelers" and "keeping 'manager notes' on only [Hurlow] all in order to lower his ranking and deny him any promotions."  Pl.'s Resp. to Defs.' Mot for Summ. J. at 17.

Actionable adverse action is defined more broadly for retaliation than for discriminatory conduct.  *See Poullard v. McDonald*, 829 F.3d 844, 856 (7th Cir. 2016). "[A]n adverse employment action is one that well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Abebe*, 35 F.4th at 607 (citation and internal quotation omitted).

Regarding the alleged presentation penalties, the analysis is similar as it was for Hurlow's sex discrimination claim. Hurlow has not adduced evidence that managers judged his quarterly presentations more harshly than other field travelers', and he therefore cannot use those alleged penalties as a basis for his retaliation claim. Hurlow does not describe the discipline issues and manager's notes in detail. But because these issues are part of the defendants' justification for denying Hurlow a promotion, viewing the evidence in the light most favorable to Hurlow, a reasonable jury could find that these discipline issues impacted his promotion eligibility and therefore constitute a materially adverse employment action. *See Coolidge v. Consol. City of Indianapolis*, 505 F.3d 731, 735 (7th Cir. 2007) (holding reprimands accompanied by tangible job consequence amount to adverse employment actions).

### 3. Causal connection

To prevail on a Title VII or IHRA retaliation claim, a plaintiff must demonstrate "that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Gnutek v. Ill. Gaming Bd.*, 80 F.4th 820, 824 (7th Cir. 2023) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013). To demonstrate a causal connection a plaintiff can rely on "circumstantial evidence, which may include suspicious timing, ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual." *Gnutek*, 80 F.4th at 824 (citation omitted).

Hurlow points to "suspicious timing," "how [Hurlow] was treated differently than the other Field Travelers," and the defendants' allegedly "pretextual explanation." Pl.'s Resp. to Defs.' Mot. for Summ. J. at 17. None of these arguments are persuasive.

33

First is the claimed temporal proximity. After his January 2019 discrimination complaints, Hurlow next applied for a DSM position in September 2019. Where suspicious timing has been found sufficient to permit an inference of retaliation, the time period between the protected action and the alleged adverse action must be "very close." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001). The nine-month gap in this case is too attenuated. *See Lewis v. Holsum of Fort Wayne, Inc.*, 278 F.3d 706, 711 (7th Cir. 2002) (holding three-month interval did not raise inference of retaliatory intent). The same is true of TMS's failure to promote Hurlow two months later, in November 2019.

As for Hurlow's September 27, 2019 e-mail, Illingworth testified that in his phone conversation with Hurlow prior to the e-mail they discussed "the decision to promote Rachel Lee." Pl.'s L.R. 56.1 Stmt., Ex. I at 76:18-23. It is unclear whether Hurlow contends that Lee was promoted in retaliation for his September 2019 discrimination complaint, because he also asserts that TMS's failure to promote him in 2017 and 2018 constitute adverse actions for his retaliation claim, and those events pre-date his first sex discrimination complaint in January 2019. *See* Pl.'s Resp. to Defs.' Mot. for Summ. J. at 15. But in his e-mail to Illingworth, Hurlow stated that he had been "passed up" for the promotion, suggesting TMS promoted Lee *prior* to his complaint. Defs.' L.R. 56.1 Stmt., Ex. A-28 at TOYOTA000313. And Hurlow has not adduced additional evidence to establish sufficient temporal proximity between his e-mail and Lee's promotion. *See Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012) ("For an inference of causation to be drawn solely on the basis of a suspicious—timing argument, we typically allow no more than a few days to elapse between the protected activity and the adverse

action.").

Turning to the rankings, after Hurlow's January 2019 complaints, his quarterly ranking actually *improved*. In the fourth quarter of 2018, Hurlow ranked fourth among DSPMs. But in the first quarter of 2019, his ranking improved to third, and in the second quarter of 2019 he was ranked second. And if Hurlow is suggesting that the defendants initially inflated his ratings to obscure earlier discrimination, the upshot is that he cannot claim that his January 2019 discrimination complaints had a materially adverse impact on his rankings. *See Cullom v. Brown*, 209 F.3d 1035, 1041 (7th Cir. 2000) ("*Overrating* an employee may be a misguided way of avoiding controversy, but it is not an *adverse* act, let alone a material one.").

Similarly, the Court finds no evidence of suspicious timing in relation to Hurlow's disciplinary issues. Hurlow contends that what he contends were adverse actions used to depress his rankings, such as disciplinary write ups, began after his 2019 discrimination complaints. But Illingworth's e-mail to Perry while Hurlow was on FMLA leave indicated that his attachment included "performance notes and examples that have been shared with [Hurlow] dating back to November 5, 2018." Defs.' L.R. 56.1 Stmt., Ex. A-28.

Even taking as true Hurlow's assertion that disciplinary or performance issues arose after his protected activity, "[t]he mere fact that one event preceded another does nothing to prove that the first event caused the second." *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000). Hurlow must show that other circumstances are present that reasonably suggest that his 2019 complaints and the disciplinary actions are somehow related to each other. *Id.* He has not done so. Thus an inference of

retaliatory intent based on suspicious timing alone is not reasonable.

Second, Hurlow asserts generally that he was "treated differently" from the other field travelers, but he adduces no evidence of this or how it may have been connected to his complaints. Hurlow alleges that he was the only employee that Lindstrom kept "manager notes" on, but this allegation is not supported by the record: Lindstrom testified otherwise, *see* Pl.'s L.R. 56.1 Stmt., Ex. J at 207:6-8, and Hurlow has no evidence to the contrary. (That aside, there is no authority to support the proposition that a supervisor keeping notes on one of his supervisees could amount to actionable adverse action, even for a retaliation claim.)

Hurlow also contends that he was negatively impacted for going over his presentation time limit and contends that other colleagues did not receive this penalty. But as explained earlier, the evidence he cites, Lindstrom's written presentation feedback from the fourth quarter of 2019, reflects that Lindstrom noted that multiple other DSPMs and DSM also exceeded their presentation time that quarter; the feedback contains no evidence of a "penalty." *See* Defs." L.R. 56.1 Stmt., Ex. H.

Furthermore, Hurlow does not specify which managers reprimanded him and points to none of the "write ups" that he alleges negatively impacted his rankings. *See* Pl.'s Resp. Defs.' Mot. for Summ. J at 17. The only evidence this Court can discern of potential disciplinary issues that may have post-dated Hurlow's January 2019 complaint are the comments in his 2019 performance evaluation. The evaluation, by Lindstrom, evaluated Hurlow's job performance from April 1, 2018 to March 31, 2019. *See* Defs.' L.R. 56.1 Stmt., Ex. A-3 at TOYOTA000038. Lindstrom included a note about Hurlow's "time management skills." *Id.* Hurlow also stated that Lindstrom was his manager at

the time of his delayed 2019 expense reports and late arrival to certain meetings. Pl.'s L.R. 56.1 Stmt. ¶ 15. Hurlow does not dispute the accuracy of his 2019 employment evaluation. And "summary judgment for the employer is proper where the employer provides undisputed evidence that the adverse employment action is based upon the employee's poor job performance." *Lutes v. United Trailers, Inc.*, 950 F.3d 359, 369 (7th Cir. 2020).

As for the defendants' alleged "pretextual explanation," to establish a retaliatory failure to promote Hurlow must offer more than "mere self-serving appraisals." *Stephens*, 569 F.3d at 788 (citation omitted). Hurlow presents no evidence to support a causal connection other than his own contentions that the other DSM candidates were less qualified, which is insufficient to create a genuine factual dispute regarding causation. As explained earlier, Hurlow's assertion that TMS chose less qualified candidates for the open DSM positions is unsupported by the record. Because Hurlow has not provided sufficient evidence from which a reasonable jury could conclude that TMS retaliated against him for his sex discrimination complaints, the defendants are entitled to summary judgment on Hurlow's IHRA retaliation claims.

## C. FMLA claims

Under the FMLA, eligible employees can access up to twelve workweeks of unpaid leave per year for specified family and medical reasons. *See* 29 U.S.C. § 2612(a)(1). After the leave period concludes, the employee is entitled to reinstatement to his former position with the same benefits and terms as before. 29 U.S.C. § 2614(a). Hurlow asserts claims under the FMLA for interference and retaliation. An FMLA interference claim "requires only proof that the employer denied the employee his or her

37

entitlements under the Act." *Scruggs v. Carrier Corp.*, 688 F.3d 821, 825 (7th Cir. 2012) (citation omitted). In contrast, "a retaliation claim requires proof of discriminatory or retaliatory intent." *Nicholson v. Pulte Homes Corp.*, 690 F.3d 819, 825 (7th Cir. 2012).

### 1. Interference claim

It is unlawful for an employer to "interfere with, restrain, or deny the exercise of or the attempt to exercise" an FMLA right. 29 U.S.C. § 2615(a)(1). An employee claiming FMLA interference must show that: (1) he was eligible for FMLA protections; (2) his employer was covered by the FMLA; (3) he was entitled to take leave under the FMLA; (4) he provided sufficient notice of his intent to take leave; (5) his employer interfered with, restrained, or denied FMLA benefits to which he was entitled; and (6) the employee was prejudiced by the employer's actions. *Ziccarelli v. Dart*, 35 F.4th 1079, 1084-5 (7th Cir. 2022).

It is undisputed that Hurlow was an eligible employee who requested FMLA for the birth of his daughter and that TMS granted him the full 12 weeks of leave that he requested. A plaintiff that was granted FMLA leave can still prevail on an FMLA interference claim, but he must show that he was prejudiced by his employer's actions. *Id.* Interference under the FMLA includes "us[ing] the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions." 29 C.F.R. § 825.220.

Hurlow alleges that the defendants interfered with the exercise of his FMLA rights by failing to consider him for promotions while he was on leave. TMS's Job Posting, Transfer and Promotion Policy states that employees are eligible to apply for open positions while on leaves of absence. Hurlow contends that in a July 2019 meeting,

Illingworth informed him that he would not be eligible for any promotions while on leave. Illingworth denies telling Hurlow this, but as the non-moving party, Hurlow is entitled to have factual disputes resolved in his favor. *See Ziccarelli*, 35 F.4th at 1089–90 (giving plaintiff the benefit of conflicting evidence about whether supervisor stated he would be disciplined for taking leave).

Hurlow still cannot withstand summary judgment on his FMLA interference claim, however, because he has not offered evidence from which a reasonable jury could find that he was prejudiced. Specifically, Hurlow testified that the reason he did not apply for the September 2019 DSM position was not Illingworth's comments but rather because he did not have access to the company's job posting system. Pl.'s L.R. 56.1 Stmt., Ex. C at 183:182:24-183:6.

Hurlow contends that he was not actually considered for the position, but his only "evidence" seems to be the fact that he did not get the promotion, which is not actually evidence that he was not considered in the first place. Lindstrom testified that Hurlow *was* considered for that particular spot and that all current DSPMs were considered for every DSM position opening. Defs.' L.R. 56.1 Stmt., Ex. B at 168:19-169:2. Illingworth likewise testified that Hurlow was considered for the position and that he told Hurlow he was not a "top candidate." Pl.'s L.R. 56.1 Stmt., Ex. I at 127:1-5; Defs.' L.R. 56.1 Stmt. ¶ 45. TMS likewise rejected Hurlow for multiple DSM opening before he took FMLA leave. In short, there is no evidence from which a reasonable jury could find a connection between Hurlow's decision to take leave and the fact that he did not get the September 2019 DSM position.

Hurlow also alleges that the defendants manipulated his performance ranking

upon his return from leave.  Although this argument appears in the interference section of his response brief, he asserts that the rankings were lowered "in response to Plaintiff's FMLA leave," which is indicative of a retaliation claim.  Pl.'s Resp. to Defs.' Mot. for Summ. J. at 13.  The Court addresses this point in the next section.

### 2.    Retaliation claim

"To prevail on a claim for retaliation in violation of the FMLA, a plaintiff must show that (1) he engaged in FMLA-protected activity; (2) his employer took an adverse employment action against him; and (3) there is a causal connection between the two." *Juday v. FCA US LLC*, 57 F.4th 591, 596 (7th Cir. 2023).  As noted above, an FMLA retaliation claim "requires proof of discriminatory intent—evidence that the employer was acting under a prohibited animus."  *Id.* (citation omitted).

A plaintiff can demonstrate discriminatory intent through the direct or indirect methods of proof.  *Burnett v. LFW Inc.*, 472 F.3d 471, 481 (7th Cir. 2006).  "Under the direct method, a plaintiff must present evidence that his employer took materially adverse action against him on account of his protected activity."  *Id.*  For the indirect method, Hurlow "must show that after taking FMLA leave (the protected activity) he was treated less favorably than other similarly situated employees who did not take FMLA leave, even though he was performing his job in a satisfactory manner."  *Hull v. Stoughton Trailers, LLC*, 445 F.3d 949, 951 (7th Cir. 2006).

Hurlow appears to attempt to proceed under both methods.  *See* Pl.'s Resp. Defs.' Mot. for Summ. J. at 17-18 (addressing both adverse actions and job performance).  But he does not identify any allegedly similarly situated employees that he contends did not take leave but were treated more favorably than him.  Thus any

attempt to prove liability under the indirect method fails.  *See Burnett*, 472 F.3d at 482.

### a.    Adverse action

Actionable adverse actions in the FMLA context include any actions that would dissuade a reasonable employee from exercising his rights under the FMLA.  *See Breneisen*, 512 F.3d at 979.  The conduct must be "more disruptive than a mere inconvenience or an alteration of job responsibilities."  *Nagle v. Village of Calumet Park*, 554 F.3d 1106, 1120 (7th Cir. 2009).

In arguing the FMLA retaliation claim, Hurlow "references and incorporates his arguments" from the IHRA retaliation section of his brief rather than listing specific adverse actions.  Pl.'s Resp. to Defs.' Mot. for Summ. J. at 18.  Many of the adverse actions Hurlow included in his IHRA retaliation section, however, cannot be used to support his FMLA retaliation claim because they occurred *before* he started FMLA leave in August 2019.  *Long v. Teachers' Ret. Sys. of Ill.*, 585 F.3d 344, 350 (7th Cir. 2009).

In his amended complaint, Hurlow cited, apparently as retaliatory, the defendants' cancellation of his reservation for the Service Performance Group Meeting in Florida.  Am. Compl. ¶¶ 72-73.  In addition, Hurlow testified that he was originally set to receive an "updated" demonstrator vehicle upon returning from leave but instead received a car that had a "considerable amount of mileage" and "some damage."  Pl.'s L.R. 56.1 Stmt., Ex. C at 161:22-162:21.

The defendants point out that Hurlow did not address these alleged adverse actions in his response brief and they argue he waived any argument on these points. The Court agrees.  *See Cincinnati Ins. Co. v. E. Atl. Ins. Co.*, 260 F.3d 742, 747 (7th Cir. 2001).  But that aside, these actions do not qualify as actionable adverse action.

Hurlow has not provided evidence that would permit a reasonable juror to find that cancelling his reservation for a conference or giving him a company car with more mileage and damage than the one he had picked out would dissuade a reasonable employee from exercising FMLA rights. *See Bell v. E.P.A.*, 232 F.3d 546, 555 (7th Cir. 2000) (holding defendant cancelling conference called by plaintiff was not adverse action); *Brown v. Chi. Transit Auth.*, No. 17 C 8473, 2020 WL 777296, at *9 (N.D. Ill. Feb. 14, 2020) (holding the denial of a new company car did not amount to an adverse employment action).

Hurlow's main contention involves the denial of promotion, and "[f]ailing to promote an employee is a materially adverse employment action for purposes of the FMLA." *Malin v. Hospira, Inc.*, 762 F.3d 552, 562 (7th Cir. 2014). As defendants point out, TMS selected candidates for the 2017 and 2018 DSM positions prior to Hurlow taking leave. These cannot be used to support his FMLA retaliation claim. The Court therefore focuses on the September 2019, November 2019, and 2020 promotions.

**b.    Causal connection**

Hurlow has not offered evidence from which a reasonable jury could find a causal connection between the denial of promotion and his exercise of his FMLA rights.

Hurlow points to the "plummet" of his quarterly rankings following his return to work. Specifically, after returning from FMLA leave, Hurlow was ranked fourth in the fourth quarter of 2019, fifth in the second quarter of 2020, fifth in the third quarter of 2020, and fourth in the fourth quarter of 2020. But the evidence reflects that employee rankings fluctuated from quarter to quarter. *See* Defs.' L.R. 56.1 Stmt. ¶ 76. Perhaps more importantly, the fourth quarter of 2019 was not the first time Hurlow had been in

42

the bottom two of the rankings; he was ranked fourth in the fourth quarter of 2018, long before he requested FMLA leave. *See* Defs.' L.R. 56.1 Stmt., Ex. A-12.

Hurlow does not meaningfully attempt to dispute the evidence regarding his job performance issues, such as the fractured dealer relationship and his failure to attend meetings on time. He has not offered evidence from which a reasonable juror can conclude that his quarterly rankings after his FMLA leave were lowered in retaliation.

### c. Pretext

Nor is there any other evidence that could show a causal connection between Hurlow's taking of FMLA leave and the promotion denials. Hurlow addresses pretext, which is typically an issue under the "indirect" method of proof (which, as noted earlier, Hurlow does not follow), but it also could be cited as circumstantial evidence of retaliation. As discussed above, however, there is ample evidence that TMS considered Szeliga and Lee highly qualified for the DSM position. *See* Defs.' L.R. 56.1 Stmt. ¶ 49; Pl.'s L.R. 56.1 Stmt, Ex. I at 92:11-21. Winkler was chosen for the November 2019 DSM position. Lindstrom testified that Winkler received a strong recommendation from Toyota's Cincinnati Region and that TMS hired him due to his "job level, his responsibility, his ability to lead, execute, change" and "his relationships with dealers." Defs.' L.R. 56.1 Stmt., Ex. B at 174:4-18. Lindstrom further testified that he recommended Winkler over Hurlow for multiple reasons, including a "relationship challenge" that Hurlow had with managers at a Lexus dealership, his late expense reports, and his issues with timeliness. *Id.* at 174:22-175:15. Lindstrom stated that he "didn't feel [Hurlow] was ready for more responsibility as a district sales manager." *Id*. Illingworth testified that Winkler was chosen because of his "leadership and

communication skills" and strong "dealer relations."  Defs.' L.R. 56.1 Stmt., Ex. I at 82:11-23.

In sum, Hurlow has adduced no evidence that would permit a reasonable jury to find that the defendants did not genuinely believe that Lee, Winkler and Szeliga were more qualified for the DSM position.  For all of these reasons, the defendants are entitled to summary judgment on Hurlow's FMLA retaliation claim.[3]

**Conclusion**

For the foregoing reasons, the Court grants Defendants' motion for summary judgment [dkt. no. 85] and directs the Clerk to enter judgment stating as follows: Judgment is entered in favor of the defendants and against the plaintiff.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  February 20, 2024

---

[3] Because the defendants are entitled to summary judgment on the merits on all of Hurlow's claims, the Court need not address whether TMNA qualifies as an "employer" under the FMLA or IHRA.